UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA WHITE | |
| Plaintiff, | CV: 21-6181 |
| - against - | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| BLUE POINT BREWING COMPANY, INC., CALEB NAGEL, CAROLINE SHAFIR (Sued In Their Individual Capacities Pursuant to New York Executive Law §290 *et seq*), | |
| Defendants. | |

Plaintiff, Joshua White ("Plaintiff"), by his attorneys SCOTT MICHAEL MISHKIN, P.C., hereby complain of Defendants Blue Point Brewing Company, Inc. ("BPB"), Caleb Nagel ("Nagel") and Caroline Shafir ("Shafir") (collectively referred to as "Defendants"), as follows:

## PRELIMINARY STATEMENT

This action is brought by plaintiff as for and against BPB for employment discrimination based on race  and retaliation due to Plaintiff's engagement in protected activity pursuant to: (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.* ("Title VII"); and pursuant to (ii) New York State Human Rights Law, New York Executive Law  §§290, *et seq.* ("NYEL") and against Nagel and Shafir for employment discrimination based on race and retaliation due to Plaintiff's engagement in protected activity.

## JURISDICTION

FIRST:        This Court has jurisdiction under 28 U.S.C. §1331 and 28 U.S.C.  §1343, and supplemental jurisdiction over Plaintiff's pendant claims brought under NYEL pursuant to 28 U.S.C. §1367(a) as they arise from the same events and controversy.

## VENUE

SECOND:     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant conducts business within this District as well as this District being where the causes of action arose.

THIRD:        The unlawful practices alleged below were committed within the State of New York, County of Suffolk.

FOURTH:     The locations at which the causes of action arose are in the County of Suffolk in the Eastern District of New York.

## PARTIES

FIFTH:        Plaintiff is an African-American male residing in Suffolk County, New York.

SIXTH:        Plaintiff was an "employee" as defined by Title VII and NYEL.

SEVENTH:    At all relevant times to this action, defendants were the plaintiff's "employer" as defined by Title VII and NYEL, in that they engaged in an industry affecting commerce and employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks.

EIGHTH:      Defendant BPB is a Brewing Company that is located on Long Island, in Patchogue, New York.

NINTH:        At all times relevant to this action, Nagel was BPB's Human Resources ("HR") and Plaintiff's supervisor.

TENTH:        Nagel has and had the authority to assist in the hiring, firing and disciplining of employees at BPB.

2

ELEVENTH: Nagel has and had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his willful discriminatory and retaliatory actions.

TWELFTH:   Nagel aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff.

THIRTEENTH:      Nagel actually participated in the conduct giving rise to Plaintiffs' claims and is thereby individually liable for his willful discriminatory and retaliatory actions.

FOURTEENTH:      Nagel, in a supervisory position, willfully and with the malicious intent to cause Plaintiff harm, discriminated against Plaintiff due to his race and retaliated against plaintiff for his engagement in protected activity.

FIFTEENTH: Nagel had personal involvement in unlawfully discriminating against Plaintiff and is therefore personally liable.

SIXTEENTH: At all times relevant to this action, Shafir was BPB's Human Resources ("HR") and Plaintiff's supervisor.

SEVENTEENTH:     Shafir has and had the authority to assist in the hiring, firing and disciplining of employees at BPB.

EIGHTEENTH:      Shafir has and had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her willful discriminatory and retaliatory actions.

NINETEENTH:      Shafir aided, abetted, incited, controlled, compelled, and/or coerced the acts against Plaintiff.

TWENTIETH:      Shafir actually participated in the conduct giving rise to Plaintiffs' claims and is thereby individually liable for her willful discriminatory and retaliatory actions.

3

TWENTY-FIRST:    Shafir, in a supervisory position, willfully and with the malicious intent to cause Plaintiff harm, discriminated against Plaintiff due to his race and retaliated against plaintiff for his engagement in protected activity.

TWENTY-SECOND: Shafir had personal involvement in unlawfully discriminating against Plaintiff and is therefore personally liable.

## FACTS

TWENTY-THIRD:    Plaintiff began his employment with Defendant BPB on April 11, 2019 as a Line Cook.

TWENTY-FOURTH: In March of 2020, Plaintiff was informed that his supervisor, Alan Button ("Button") and Respondent's Head Chef, Charlie, considered Plaintiff to be a part time employee.

TWENTY-FIFTH:    Plaintiff was confused because when he was hired he was offered the position as a full time Line Cook and furthermore Plaintiff regularly worked Forty (40) hour weeks and at times worked in excess of Forty (40) hours per week, indicating a full-time status.

TWENTY-SIXTH:    Following this, Plaintiff went to BPB's Human Resources ("HR") and spoke with Caleb Nagel ("Nagel").

TWENTY-SEVENTH:    Plaintiff complained to Nagel that he felt Defendant BPB was discriminating against him based on him being an African American.

TWENTY-EIGHTH: Plaintiff expressed that he was hired as a full time Line Cook and that this new designation all of a sudden as a part time Line Cook was disparate compared to his similarly situated Caucasian co-workers.

TWENTY-NINTH:    Defendant   BPB's   General   Manager,   Adam   Lancashire ("Lancashire"), was informed of Plaintiff's complaint.

THIRTIETH: In April 2020, Lancashire met with Plaintiff and asked him what were some of his concerns.

THIRTY-FIRST:      Plaintiff stated that he felt that he was being discriminated against and being mistreated.  Plaintiff also expressed  that he has been at Defendant BPB for a year and a half without a raise or a bonus.

THIRTY-SECOND:   Plaintiff also stated that it was unfair that Defendant BPB had him acting as the Supervisor closing for the night shift and arranging meetings amongst the staff and was not receiving the Supervisor pay, Plaintiff also stated that he was not being allowed to clock in as Lead Line Cook as the regular Supervisor  does when he opens or closes.

THIRTY-THIRD:      Plaintiff went on and stated that he has been doing duties outside of his job description like being put in the dish pit to do dishes and also shuck oysters without the proper training and did not receive the appropriate wage to match the change in responsibilities.

THIRTY-FOURTH:   Lancashire agreed that Plaintiff should have had a raise and that he would be speaking with the Head Chef and Nagel from HR.

THIRTY-FIFTH:      Plaintiff asked Lancashire about his full time roll, specifically, why was he being over looked and passed up for the position and promotion when there are at least five full time positions available.

THIRTY-SIXTH:      Lancashire, revealing the discriminatory intent, told Plaintiff that he will be completely honest, that when he (Lancashire) asked Head Chef Charlie about Plaintiff going full time he was told by Head Chef Charlie that he didn't want to offer and give Plaintiff a full time roll because he was afraid Plaintiff was going to use all of the time from his benefits, Lancashire also told Plaintiff that Head Chef Charlie told him that Plaintiff is not reliable and not dependable.

THIRTY-SEVENTH: In order to demonstrate the pretext of Lancashire's statement, Plaintiff said if he was not reliable or dependable why does Head Chef Charlie and Lancashire leave him to close the kitchen when the Head Chef or the Supervisor is not there.

THIRTY-EIGHTH:   Lancashire responded that he sees what Plaintiff does and he does an amazing job.

THIRTY-NINTH:   Lancashire then asked Plaintiff what he was looking for as an end result.

FORTIETH:   Plaintiff told him he would like a raise and to know where exactly he stands in the kitchen.  Plaintiff then told Lancashire that he was being discriminated against and mistreated because he was being treated less favorably than similarly situated co-workers.

FORTY-FIRST:   Plaintiff stated how his hours would get cut in retaliation if he were to call out sick or went home early after feeling ill. Lancashire said that was unfair and that he would get back to Plaintiff after talking with Nagel and the Head Chef.

FORTY-SECOND:   On July 17, 2020 Plaintiff and Nagel met to discuss Plaintiff's complaint and fill out paperwork for medical insurance.

FORTY-THIRD:   Nagel told Plaintiff he was eligible for benefits but there were no full time positions available.

FORTY-FOURTH:   Nagel stated the full time position could take up to anywhere from a couple weeks to a few weeks, maybe even a month before it opens and that if the roll was going to take time to open up he would then give Plaintiff a raise first, but if not and it opens up sooner than expected then they would give Plaintiff the raise the same time as the spot opens up.

FORTY-FIFTH:   Plaintiff also asked Nagel if he found out why he was only offered a full time position after a year and a half.

6

FORTY-SIXTH:     Plaintiff strongly felt he was being discriminated against due to his race.

FORTY-SEVENTH:   Nagel stated he couldn't exactly pinpoint what the cause of error was but said it could possibly be because of Plaintiff's attendance or work performance.

FORTY-EIGHTH:    Plaintiff disputed the fact that it had to do with any of those factors because Defendant BPB's Head Chef has Plaintiff acting as a Supervisor closing the kitchen at night and doing other supervisory duties.

FORTY-NINTH:     Plaintiff stated he was never told verbally or had any written reprimands for any absences or tardiness or any indication of poor performance.

FIFTIETH:    Moreover, Lancashire just got finished telling Plaintiff that he personally observed Plaintiff's performance and that is was amazing.

FIFTY-FIRST:     Plaintiff stated that his co-workers were terminated, all who had full time positions, all who came in after Plaintiff and Plaintiff was still not being offered the position and asked what the reason was.

FIFTY-SECOND:    Nagel asked Plaintiff if he had a conversation with Head Chef Charlie about the fulltime position.

FIFTY-THIRD:     Plaintiff told Nagel he did not as he was not comfortable approaching him about it.

FIFTY-FOURTH:    Plaintiff also stated that from what other co-workers would tell him, Head Chef Charlie was stating harsh and untrue things about Plaintiff. Plaintiff learned that Head Chef Charlie would say that Plaintiff is lazy, a bum and doesn't want to work or be there.

FIFTY-FIFTH:     The Head Chef's derogatory comments regarding Plaintiff began after Plaintiff and the Head Chef had discussion about affirmative action, with Plaintiff on one side of the argument and the Head Chef on the other.

FIFTY-SIXTH:     Plaintiff stated to Nagel that he has had conversations about affirmative action, lead by Defendant BPB's Head Chef. Plaintiff explained that he voiced his opinion and that may have caused the Head Chef to develop the discriminatory animus.

FIFTY-SEVENTH:   Plaintiff asked about his complaints from back in March 2020 regarding the discrepancy of not having a full time position when there was nothing on paper stating part time.

FIFTY-EIGHTH:    Nagel stated that he will go back and do an Affordable Care Act look-back and see if there were any indications that may have hindered Plaintiff from getting it.

FIFTY-NINTH:     On August 12, 2020 Plaintiff hadn't received a clear update from Lancashire, Nagel or Head Chef Charlie.  Plaintiff emailed Nagel asking him for an update on the things they previously discussed a few weeks ago as far as the raise and full time position.

SIXTIETH:    On August 14, 2020 Nagel emailed back stating he talked with Lancashire and will follow up with Head Chef Charlie to set up a time for them to meet and that the General Manager needs to be on board for the changes to be made.

SIXTY-FIRST:     On September 1, 2020, Plaintiff emailed Defendant BPB's General Manager, Carrie Shafir ("Shafir"), and Nagel stating that he feels that Defendant BPB is discriminating against him due to his race.

SIXTY-SECOND:    Shafir then emailed back and said she was out of the office on vacation with limited access to her emails, to call her if the matter was important. Plaintiff replied back and said he will reach back out to Nagel.

8

SIXTY-THIRD:        Plaintiff sent a text message to Nagel on September 1, 2020 asking if he would be available tomorrow to talk about Plaintiff's complaint. Nagel text back on September 2, 2020, saying he was available today.

SIXTY-FOURTH:        Plaintiff met Nagel and expressed that he feels he is being discriminated against because of his race.

SIXTY-FIFTH:        Plaintiff stated that he has been subjected to disparate treatment, how a similarly situated Caucasian co-worker, who started after Plaintiff, was able to transition into a full time position before Plaintiff.

SIXTY-SIXTH:        Plaintiff also stated that this is the same co-worker who stayed home during COVID-19 on unemployment, compared to Plaintiff who was not given the option to go on unemployment. Plaintiff stated how he was the only part-time employee that had to work during the COVID-19 shut down.

SIXTY-SEVENTH:        Plaintiff also stated that four (4) full time positions are open that have not been filled.

SIXTY-EIGHTH:        Plaintiff also stated to Nagel that he was never told by Defendant BPB that he was ever considered part-time.  Plaintiff never worked a part-time schedule nor was one ever given to him.    Plaintiff was never given the option of a part time schedule or the ability to pick up additional hours, instead Plaintiff was placed on the schedule with full time hours.

SIXTY-NINTH:        Plaintiff also stated to Nagel that since the Summer of 2019 his job duties have changed and he was now being given Supervisory duties without being allowed to clock in as a Supervisor, unlike his similarly situated co-worker who is able to.

SEVENTIETH:        Nagel then replied and said he had no knowledge of that and he would make the changes since that is something necessary, however, Nagel never made the promised changes.

SEVENTY-FIRST:   Nagel asked Plaintiff why he said "acting as the Supervisor." Plaintiff stated to Nagel that ever since the summer of 2019 his job objectives and criteria changed, with responsibilities increasing overtime but his job classification and salary did not match the changes.

SEVENTY-SECOND:        Plaintiff detailed further instances where he had the good faith belief he was being discriminated against due to his race.

SEVENTY-THIRD:  Defendant BPB's Head Chef put in his two weeks notice and Plaintiff said that the Head Chef position was not offered to him despite Plaintiff performing the duties of Defendant BPB's Head Chef.

SEVENTY-FOURTH:        Nagel told Plaintiff he posted the job position two (2) weeks ago and that Plaintiff should have applied for the position. Nagel then stated Plaintiff still had a chance and opportunity to apply.

SEVENTY-FIFTH:   Plaintiff told Nagel that he already felt at a disadvantage due to the disparate treatment he had been experiencing.

SEVENTY-SIXTH:  Plaintiff stated that since Plaintiff was already fulfilling the position, as far as the duties are concerned, Defendant BPB should have offered him the open position.

SEVENTY-SEVENTH:        In a display of discriminatory animus directed at Plaintiff, Nagel asked Plaintiff if the Supervisor, Button, was interested in the position, completely ignoring the fact that Plaintiff had just expressed a desire to fill the Head Chef position.

SEVENTY-EIGHTH: Plaintiff said he did not know, but stated he, on the other hand, would definitely like to accept the position being that he has the capability, skills and experience to do so.

SEVENTY-NINTH: In order to expedite the process and show his commitment to the Head Chef position, Plaintiff stated that his application, date of hire, resume and attached cover letter are all on file with Defendant BPB. Plaintiff also indicated that he is more than willing to do a presentation of food items on a new menu if necessary.

EIGHTIETH: Plaintiff asked Nagel about a previous employee, Angel G., who had a full time position and what happened to the position when he left.

EIGHTY-FIRST: Nagel then replied and said the position was still there, despite the employee being gone for approximately 6 months.

EIGHTY-SECOND: Plaintiff then replied if it's there and its sitting how come it has not been offered to him considering the last time they met Plaintiff was told he was eligible for the full time benefits but the full time position was not available.

EIGHTY-THIRD: Nagel replied that Plaintiff was correct but, to hide the discriminatory animus, attempted to blame the "system" claiming it is by selection and not in order and that it is performance based.

EIGHTY-FOURTH: Nagel stated he had to go back and do a Affordable Care Act look up and see if Plaintiff was eligible. However, Plaintiff was told that based on a previous ACA look-up he was eligible for the full time position.

EIGHTY-FIFTH: Plaintiff mentioned that since the beginning of his employment with Defendant BPB he has totaled over forty (40) hours since day one up until this year, due to the COVID-19 pandemic when his hours were cut down to Thirty/Thirty-Four (30-34) hours.

EIGHTY-SIXTH:     Plaintiff asked why was he being over looked for the open full time positions, and Nagel responded and said when he went to Lancashier, he gave him a hard time and did not want to sign off on Plaintiff's full time position.

EIGHTY-SEVENTH: Nagel stated Lancashire has the last say and Lancashire told him he didn't want to give it to Plaintiff because he was afraid Plaintiff was going to use up his time going on vacation.

EIGHTY-EIGHTH:     Plaintiff told Nagel he had sat down with Lancashier one on one and he never mentioned that he had a problem or issue with Plaintiff becoming full time.

EIGHTY-NINTH:     To further demonstrate the discriminatory treatment, Plaintiff informed Nagel that he was the only line cook that did not get to take a vacation like the rest of Defendant BPB's line crew.  Plaintiff also told Nagel that there were days when he was sick and had to stay at work because he was afraid of being retaliated against by having his hours or days cut short because the Head Chef did not like him calling out.

NINETIETH: Plaintiff stated that when he did try and leave or did call out for emergency purposes, the Head Chef would do spiteful things like yell and shout, he would slam utensil and kitchen ware around and would also tell Plaintiff's Supervisor that if he calls out or attempts to go home early he was going to write Plaintiff up.

NINETY-FIRST:     This further demonstrates the adverse discriminatory treatment because other similarly situated Caucasian co-workers would call out numerous times, left early and also did no call no shows and were never written up or told that they would be if it happened again.

NINETY-SECOND: Plaintiff expressed that Defendant BPB's General Manager, Lancashier, has discriminatory animosity towards him and felt if he took the Head Chef position he would be set up for failure.

NINETY-THIRD:   Plaintiff also expressed his concerns about who was going to uphold the Head Chef position and that it was going to be wrong for Plaintiff to be demoted back to his regular position once someone comes to replace him meanwhile, he would already be performing the duties of the Head Chef.

NINETY-FOURTH:   Nagel told Plaintiff that if he wanted a shot that he should see him or Shafir about applying for it.

NINETY-FIFTH:   At this point, Plaintiff reiterated that he still felt discriminated against due to his race as well as being mistreated because his complaints and questions have been met with inconsistent answers or not answered at all.

NINETY-SIXTH:   Plaintiff stated it was hard to speak out every time something happened because when he did, he would be retaliated against by having hours and days cut from his schedule as well as his character being assassinated on the job.

NINETY-SEVENTH: Additionally, Plaintiff is aware of co-workers who formally complained and no corrective action was taken.

NINETY-EIGHTH:   Plaintiff brought up that in 2019, Marie was discriminated against because of her gender. She went to Defendant BPB's HR to complain and HR did nothing but make the situation worse by instigating the matter until the point Marie felt so uncomfortable and ended up resigning.

NINETY-NINTH:   Plaintiff stated how the head chef would make him do other co-workers duties on top of his own work load to make other peoples work load easier.

ONE HUNDREDTH: Plaintiff also told Nagel he felt people of color received more severe punishment then similarly situated Caucasian co-workers.

ONE HUNDRED FIRST:   Plaintiff stated how Defendant BPB never terminated Lancashire for having a DUI, nor was he placed on suspension, he also engaged in sexually explicit conduct with another co-worker on Defendant BPB's property without being suspended or terminated he was just written up.

ONE HUNDRED SECOND: Plaintiff also mentioned how the bartender/bus boy, Craig, was fired and brought back at least two times despite Craig being caught making drug transactions in the parking lot and also was caught by the Head Chef taking the general manager's car to go buy drugs.

ONE HUNDRED THIRD:   Plaintiff also mentioned how another Caucasian co-worker, Paul, was falling asleep while operating machinery on different occasions and he was not written up, suspended or terminated.

ONE HUNDRED FOURTH:      Instead, he was given a transfer to the kitchen without having to submit an application or resume but was falling asleep with knifes in his hand and was never written up.

ONE HUNDRED FIFTH:    Plaintiff also stated how another Caucasian co-worker from the warehouse vandalized and destroyed property and was still able keep his job after many incidents leading up to the most crucial incident before deciding to let him go.

ONE HUNDRED SIXTH:    Plaintiff also stated that the majority of the line crew members are African American or Hispanic descent and seemed to be the only ones not getting proper breaks.

ONE HUNDRED SEVENTH:          Plaintiff also asked Nagel if he was able to give a breakdown as to where all the open full time positions were and why certain individuals got it before Plaintiff.

ONE HUNDRED EIGHTH: Nagel replied he still wasn't too sure and asked for the names again.

ONE HUNDRED NINTH:    Plaintiff replied Marie, Alan, Eric, Angel, Chris and Paul all had full time positions.

ONE HUNDRED TENTH:    Plaintiff explained that Chris came in after Plaintiff and was able to obtain the full time position before him. Plaintiff said he felt mistreated because he did Defendant BPB a favor by adding help and in return they gave that individual the full time position before Plaintiff.

ONE HUNDRED ELEVENTH:      Plaintiff stated to Nagel that he and Lancashire both told him that if he worked over Thirty (30) hours for a certain period of time that he should have automatically been offered the full time position.

ONE HUNDRED TWELFTH:      Plaintiff stated that Defendant BPB's management team failed and overlooked Plaintiff and he would like to know exactly why this happened and who is responsible for such actions.

ONE HUNDRED THIRTEENTH:    Nagel then asked what Plaintiff was looking to have happen after this conversation.

ONE HUNDRED FOURTEENTH:  Plaintiff said he would like for Defendant BPB to conduct an investigation and for a paper trail of his complaints and the investigation request so no one can say Plaintiff never came and complained.

15

ONE HUNDRED FIFTEENTH:     Plaintiff also stated that during the investigation he would like to take a leave of absence until the matter is resolved because he was afraid of retaliation and did not want to continue in a hostile and intolerable work environment. Plaintiff specifically stated he did not want to work in the presence of the Head Chef or Lancashire until Defendant BPB asked them what the issues they had with Plaintiff were.

ONE HUNDRED SIXTEENTH:     Nagel replied back and said he would grant the leave of absence until the matters are resolved.

ONE HUNDRED SEVENTEENTH: On September 10, 2020, there was still no update from Defendant BPB so Plaintiff emailed Nagel and Shafir asking for an update on the investigation.

ONE HUNDRED EIGHTEENTH:   Nagel replied asking for Plaintiff to stop in the next day to meet with him and Lancashier. Plaintiff replied stating that he would prefer the next sit down to consist of just Shafir, Nagel and himself.

ONE HUNDRED NINETEENTH:   Plaintiff also asked if he was getting paid for the leave of absence, to obtain a copy of any and all personnel records Plaintiff has on file, that he is still waiting for the leave of absence letter and, if he needs to fill out any or other necessary paperwork.

ONE HUNDRED TWENTIETH:     Nagel replied saying he will be happy to set up the meeting with himself, Plaintiff, and Shafir.

ONE HUNDRED TWENTY-FIRST:Nagel also stated he requested Lancashire to have Plaintiff on an unpaid leave and unscheduled during the leave of absence.

ONE HUNDRED TWENTY-SECOND:     Nagel stated when they meet next that it would be paid and he was looking into the personnel file request.

16

ONE HUNDRED TWENTY-THIRD:        On September 16, 2020 Plaintiff met with Nagel and Shafir. Nagel said how he has a copy of the w-4 form and some other copies of the documents requested and some he would get back to Plaintiff on.

ONE HUNDRED TWENTY-FOURTH:        Plaintiff asked how did they conduct their investigation. Nagel said that they conducted multiple investigations.

ONE HUNDRED TWENTY-FIFTH:        Plaintiff asked what was the determination and Shafir then intervened and said that Plaintiff asked for the toxic people to be gone and now they have gotten rid of the Head Chef and Lancashire and that the culprits are no longer with Defendant BPB and that they're going to leave Michelle and Shane in leadership and that they're going to move forward with them.

ONE HUNDRED TWENTY-SIXTH:        Plaintiff stated that he still keeps in contact with former employees and they all mentioned none of their statements were taken. Plaintiff stated that the investigation was not conducted to its full potential or extent.

ONE HUNDRED TWENTY-SEVENTH:    Plaintiff stated that he strongly felt discriminated against because of his race and was still being mistreated because he has not been given a full time position and that multiple people obtained it before him.

ONE HUNDRED TWENTY-EIGHTH:        Plaintiff was highlighting the discriminatory intent and demonstrating that Defendants' excuses were merely a pretext to hide the true discrimination.

ONE HUNDRED TWENTY-NINTH:        Plaintiff also asked why on September 2, 2020, when he sat down with Nagel and formally complained about not being given a full time position then days later on September 10, 2020 Defendant BPB posted an add looking for a full time/part time cook.

17

ONE HUNDRED THIRTIETH:      Plaintiff stated it was unfair and mistreatment because he just complained numerous times about being passed up on the full time position.

ONE HUNDRED THIRTY-FIRST:  Plaintiff stated it was unfair that he was not getting paid for the leave of absence because it was not his fault Defendants created a hostile and intolerable work environment.

ONE HUNDRED THIRTY-SECOND:      Nagel said it was because he was not eligible for full time benefits.

ONE HUNDRED THIRTY-THIRD: However, Nagel was the one who told Plaintiff he was eligible for the benefits but there was no open position for him.

ONE HUNDRED THIRTY-FOURTH:      Plaintiff replied and said if he rightfully had the full time position, with benefits, from the beginning when he should have, they would not be having this conversation.

ONE HUNDRED THIRTY-FIFTH: Plaintiff brought up if he would be paid for this meeting.

ONE HUNDRED THIRTY-SIXTH: Nagel said yes because you came into work. Plaintiff then stated if he gets paid for today's meeting how come he did not get paid for the meeting they had on September 2, 2020.

ONE HUNDRED THIRTY-SEVENTH:      Nagel replied and said he can go back and pay Plaintiff for that day. Plaintiff asked why Nagel gets to pick and choose when to pay Plaintiff because if he had said nothing then it would be further lost wages.

ONE HUNDRED THIRTY-EIGHTH:      Plaintiff stated how he felt degraded and felt that his character had been sabotaged because he was passed up on opportunities.

ONE HUNDRED THIRTY-NINTH: Shafir said that they never got an application or resume on their desk from Plaintiff for the Head Chef position.

ONE HUNDRED FORTIETH:      Plaintiff stated why is it that he has to go through this process when no one else who made a transition to a new position had to resubmit an application and resume.

ONE HUNDRED FORTY-FIRST:   In an act of retaliation, Shafir said it looks like Plaintiff has burned his bridges at Defendant BPB to a point of no return, that if Plaintiff wants to walk away and resign that they will be okay and fine with that.

ONE HUNDRED FORTY-SECOND:      Plaintiff replied back to Shafir and said he didn't know he did anything to burn any bridges.

ONE HUNDRED FORTY-THIRD:  They both asked Plaintiff what was he looking for and he replied if they can eliminate Shane and Michelle, as they were the head chef's bosses above him and did not intervene in his bad behavior,  or even a possible demotion, he would be happy with that.

ONE HUNDRED FORTY-FOURTH:      They both asked why Plaintiff felt this way towards these two individuals and Plaintiff replied and said because of poor team leadership.

ONE HUNDRED FORTY-FIFTH:   Plaintiff stated they were not reputable and also condoned the discriminatory behavior.

ONE HUNDRED FORTY-SIXTH:      Shafir then said they were not going to get rid of them and that they were going to proceed and move forward. Plaintiff stated that since Defendant BPB didn't want to get rid of them can they come up with a developmental plan or mediation so that issues may be resolved.

ONE HUNDRED FORTY-SEVENTH: They both refused and said they were not willing to do so.

ONE HUNDRED FORTY-EIGHTH: Plaintiff also stated that as another part of the resolution he felt he was entitled to compensation for wages lost.

ONE HUNDRED FORTY-NINTH: Shafir said that they will not pay back pay and Nagel nodded his head and said no as well.

ONE HUNDRED FIFTIETH: Plaintiff expressed that he felt it was unfair that he was going to get a full time position with no raise, no bonus and no promotion. Plaintiff stated he still felt he was being mistreated and discriminated against and stated he didn't feel Defendant BPB was not 100 percent in cooperation and compliance.

ONE HUNDRED FIFTY-FIRST: Plaintiff stated that since they can't come to a mutual agreement and he didn't feel they were being fair, he would have no choice but to seek guidance from a higher stature from outside Defendant BPB's walls.

ONE HUNDRED FIFTY-SECOND: Shafir interrupted and said they were going to conclude the conversation at that point.

ONE HUNDRED FIFTY-THIRD: Plaintiff asked why and Nagel said yes, were going to end this discussion because you're telling us our positions can be in jeopardy.

ONE HUNDRED FIFTY-FOURTH: Plaintiff said he will report to the Department of Labor, Divisions of Labor and Wages, the EEOC and the Human Rights Division if he doesn't get any clear objectives and determinations.

ONE HUNDRED FIFTY-FIFTH: Both Shafir and Nagel got up from the table and Shafir said well you can do what you have to do since you're going to seek help from a high stature.

ONE HUNDRED FIFTY-SIXTH:    Plaintiff then said since you are walking away from the table what does this lead him to believe right now? Plaintiff said he was going to report it because it seemed like they were trying to cover the situation up instead of trying to make the situation better.

ONE HUNDRED FIFTY-SEVENTH:    Nagel replied and said you're going to continue on unpaid and unscheduled leave until September 23, 2020.

ONE HUNDRED FIFTY-EIGHTH: This was in direct retaliation for Plaintiff indicating he was going to take his complaints higher because previously Nagel said the leave of absence would be paid.

ONE HUNDRED FIFTY-NINTH:    Plaintiff replied that he would like that written down on paper and to receive a copy because he initially asked for a leave of absence letter on September 2nd and still has not received one.

ONE HUNDRED SIXTIETH:    Plaintiff said he felt uncomfortable walking out of the building without a verified letter stating that on paper because he did not want anyone accusing him of abandoning or neglecting the job.

ONE HUNDRED SIXTY-FIRST:    On September 21, 2020 Plaintiff emailed both Nagel and Shafir stating he was reaching his return date and wanted to know what he would be returning as.

ONE HUNDRED SIXTY-SECOND: Shafir emailed back stating Plaintiff would return to his current position part time, she also stated as Nagel mentioned last week, when they do an ACA look back in October, Plaintiff will be eligible for medical benefits based on the average hours worked over the last 12 months.

ONE HUNDRED SIXTY-THIRD:   Shafir also stated that when Defendant BPB hires a new Head Chef, the Head Chef will determine whether or not if they would like to convert Plaintiff to full time, she also stated that Plaintiff had mentioned he wanted to apply for the Head Chef position but has not yet seen an application come in and that this is performance based and not seniority based.

ONE HUNDRED SIXTY-FOURTH: Plaintiff emailed Shafir back and stated he accepts the position but would like to retain part time hours on the schedule unless he volunteers to pick up additional hours, until he was officially eligible for a full time role.

ONE HUNDRED SIXTY-FIFTH:   Plaintiff advised that he was still being discriminated against in the workplace due to his race and now being retaliated against because he formally complained and as a result was not being offered the Head Chef position and any full time positions fairly or in an equal way as was done with other Caucasian co-workers.

ONE HUNDRED SIXTY-SIXTH:   On September 22, 2020 Lindsay Bodisch ("Bodisch") called Plaintiff and left a voice mail stating she was from Denver and was Defendant BPB's HR Director and that she had some complaints forwarded over to her about race discrimination and that she wanted to take some time out and hear from Plaintiff to investigate and start interviewing people.

ONE HUNDRED SIXTY-SEVENTH:      Plaintiff called Bodisch back and she stated how he had a major concern over the emails forwarded to her. She then asked for Plaintiff to kindly explain and go into detail about the situation.

ONE HUNDRED SIXTY-EIGHTH: Plaintiff started by saying he felt discriminated against because of his race and that he has been passed up on promotions, his responsibilities

increased over time though his wage did not reflect that and that he was acting as the night supervisor but not permitted to clock in as lead line cook.

ONE HUNDRED SIXTY-NINTH:   Plaintiff also stated the following: 1) how a Caucasian co-worker came from the warehouse and got the full time role before Plaintiff; 2) that Three (3) people with full time positions have been terminated and their positions are still open; 3) that Three (3) people came in after Plaintiff but were able to obtain the full time position before him.

ONE HUNDRED SEVENTIETH:    Bodisch asked for the names of the people that were terminated and who came in after Plaintiff that got the positions.

ONE HUNDRED SEVENTY-FIRST:     Plaintiff stated he has seniority over these people and it was unfair that he was at the bottom of the barrel awaiting a position.

ONE HUNDRED SEVENTY-SECOND:     Plaintiff also told her that Defendant BPB posted an add on the internet looking for a full time/part time cook while he was on a leave absence after formally complaining to them about being overlooked for the same position.

ONE HUNDRED SEVENTY-THIRD:     Plaintiff stated Shafir and Nagel never gave a clear determination on the investigation and that their responses have been inconsistent and evasive throughout the investigation. Plaintiff also stated he believed the investigation was bias because no statements were taken.

ONE HUNDRED SEVENTY-FOURTH:    Plaintiff informed Bodisch that he had sat down with Nagel and the Lancanshire several times on different occasions and they did not give him a clear explanation as to why he has been overlooked but both admitted that it should have never happened.

23

ONE HUNDRED SEVENTY-FIFTH:       Plaintiff also stated to Bodisch that he was being discriminated against regarding the Head Chef position.

ONE HUNDRED SEVENTY-SIXTH:       Bodisch asked if he had applied for the position and Plaintiff stated how it was unfair he had to go through this reapplication process when other similarly situated Caucasian co-workers did not have to re-submit and re-apply or get re-interviewed for any position they transitioned to.

ONE HUNDRED SEVENTY-SEVENTH:  Bodisch stated that it's Defendant BPB's procedure to re-apply for the position and that their procedure is to post it internally and externally so that in-house workers will have knowledge about the openings.

ONE HUNDRED SEVENTY-EIGHTH:       Plaintiff stated to her that other co-workers did not have to take those measures like Plaintiff was being asked, demonstrating that Plaintiff was being subjected to disparate treatment.

ONE HUNDRED SEVENTY-NINTH:       Plaintiff also stated that he had to work long shifts that consisted of 9-12 hour shifts without getting proper breaks.

ONE HUNDRED EIGHTIETH:       Bodisch replied and said she heard about intolerable behavior and hostile work environment and asked if Plaintiff could go into detail.

ONE HUNDRED EIGHTY-FIRST: Plaintiff responded that the Head Chef would treat him differently compared to other co-workers, he would say degrading and harsh things about Plaintiff to other people, he would threaten to write Plaintiff up if he tried to call out or leave early for feeling sick and would let other co-workers go home, leave and even not discipline them for no calls and no shows. He also would manipulate people and try and turn them against Plaintiff.

24

ONE HUNDRED EIGHTY-SECOND:        On October 1, 2020, Bodisch called Plaintiff to inform him of the results of her investigation.

ONE HUNDRED EIGHTY-THIRD: Bodisch stated she talked to management about breaks and said she didn't get feedback from other employees and that they said brakes were not being given towards the end of the week and stated she was told that people are getting their brakes now and feel well rested.

ONE HUNDRED EIGHTY-FOURTH:        Bodisch stated based on the investigation and statements she received, she hasn't found any racial discrimination from employees toward employees or managers toward employees.

ONE HUNDRED EIGHTY-FIFTH: She also stated she looked into Plaintiff's pay level as well to see if there was an increase that was promised. She stated there was no record of a promise.

ONE HUNDRED EIGHTY-SIXTH: She stated she knew Plaintiff told her that he had the conversation with Nagel but she doesn't find anything saying the increase was promised or owed and therefore there is no back pay over it.

ONE HUNDRED EIGHTY-SEVENTH:        She stated Nagel would give him more information regarding that matter.

ONE HUNDRED EIGHTY-EIGHTH:        Regarding the Head Chef position, Bodisch asked Defendant BPB how it was posted.

ONE HUNDRED EIGHTY-NINTH: Bodisch told Plaintiff it was posted internally and externally.

ONE HUNDRED NINETIETH:     Bodisch stated in summary some vile behavior from the Head Chef was beyond acceptable and inappropriate and that there were unnecessary threats and a hostile and intolerable working condition due to the Head Chef.

ONE HUNDRED NINETY-FIRST: She also stated that she is circling back with Defendant BPB's Management Team to ensure they cannot accept that behavior, she also stated in terms of the full time position Shafir and Nagel are going to talk to Plaintiff and that she was still looking into people moving into full time rolls before Plaintiff.

ONE HUNDRED NINETY-SECOND:     Bodisch stated she would look into the remaining items and get back with an update.

ONE HUNDRED NINETY-THIRD: On October 2, 2020 Bodisch called Plaintiff and stated she could not find a past employee or see who had a full time position before Plaintiff and that she was still digging into this.

ONE HUNDRED NINETY-FOURTH:     Plaintiff replied to Bodisch that an employee, Marie, had a full time position and so did Chris who Plaintiff brought in.

ONE HUNDRED NINETY-FIFTH: Bodisch said yes she did see Chris, and that Marie started out before Plaintiff that she was looking into the names who started after Plaintiff and who was given the full time position.

ONE HUNDRED NINETY-SIXTH: Bodisch stated Plaintiff was correct and that Chris Gordon started out part time and then was given full time position before Plaintiff.

ONE HUNDRED NINETY-SEVENTH:     She stated Nagel and Shafir would talk to Plaintiff later on in the day and wanted Plaintiff to regroup with her after so that they can go forward from there.

ONE HUNDRED NINETY-EIGHTH:        On October 2, 2022, Plaintiff met Shafir and Nagel.

ONE HUNDRED NINETY-NINTH: Shafir opened up by stating she knew Plaintiff talked to Bodisch in regards to the findings of the investigation and stated what they would like to do today is move forward offering Plaintiff a full time position based on some of the results of the investigation and that moving forward they would like to have Plaintiff as a full time employee.

TWO HUNDREDTH:        Shafir also stated she would like for Plaintiff to start the full time position the very next Monday.

TWO HUNDRED FIRST:    Nagel stated he has an offer letter in the folder, a copy for him and a copy for Plaintiff, and said they also want to do the new working week as the effective date.

TWO HUNDRED SECOND: He also stated Plaintiff will report to the new Head Chef and Respondent's General Manager once they have that person hired, he also stated Plaintiff's initial terms of employment practices and procedures are stated in the agreement.

TWO HUNDRED THIRD:    On October 6th, 2020, Nagel contacted Plaintiff for an update about the full time position, stating he would be out of the office and Plaintiff could leave it at his desk or could scan it over to him.

TWO HUNDRED FOURTH: Plaintiff stated he was able to review the terms and conditions of the agreement and would like Nagel to revise and update the agreement because it did not state a salary or wage.

TWO HUNDRED FIFTH:    Nagel responded and said thank you for the update and he would be letting Lindsay know Plaintiff will be reaching out to her.

TWO HUNDRED SIXTH:    Plaintiff called Bodisch on October 7, 2020 to let her know he met with Shafir and Nagel.

TWO HUNDRED SEVENTH:      Plaintiff informed Bodisch that he asked Nagel to include the salary/wage in the new agreement.

TWO HUNDRED EIGHTH: Plaintiff said he didn't have any clarification of any sudden change about opening an extra day, as well as extending hours, not paying holiday pay after telling Plaintiff he did not have to work holidays.

TWO HUNDRED NINTH:    Bodisch said she did not know anything about that and they are good questions for Nagel.

TWO HUNDRED TENTH:    On October 9, 2020, Nagel came to speak with Plaintiff and told Plaintiff he had the new revised letter in the folder stating the new changes as requested.

TWO HUNDRED ELEVENTH:      On October 12, 2020 Plaintiff sent Nagel a copy of the signed agreement.

TWO HUNDRED TWELFTH:     Despite Plaintiff expressing his desire for the open Head Chef position, in an act of discrimination and retaliation, Defendant BPB hired a new Head Chef and ignored Plaintiff who was qualified and had experience.

TWO HUNDRED THIRTEENTH:  Defendant BPB also hired a new Line Cook, demonstrating that Defendant BPB had open positions that Plaintiff could have assumed.

TWO HUNDRED FOURTEENTH:  When Plaintiff was on a  leave of absence for formally complaining against the new Head Chef, Palo, in retaliation he took Plaintiff's picture that consisted of him and two other African American co-workers down twice.

TWO HUNDRED FIFTEENTH:     After the picture was found and put back up he removed it permanently and disposed of it.

TWO HUNDRED SIXTEENTH:   Since May 20, 2021 until present no one at Defendant BPB has reached out to Plaintiff and failed to be correspond with him upon his leave of absence as if Plaintiff in nonexistent and no longer an employee, to let Plaintiff know about long term disability leave of absence.

TWO HUNDRED SEVENTEENTH:   Plaintiff has not received pay or other offers to any additional work benefits he may be eligible for such as a paid leave.

TWO HUNDRED EIGHTEENTH:   On or about January 15, 2021 plaintiff filed a Charge with the EEOC and received Charge number 520-2021-01430.

TWO HUNDRED NINETEENTH:   After defendants became aware of said EEOC charge they retaliated against Plaintiff by writing him up for missing a day of work when he was not even scheduled to work that day due to a religious obligation.

TWO HUNDRED TWENTIETH:   On or about August 9, 2021, Plaintiff received a right to sue letter from the EEOC bearing Charge Number 520-2021-01430.

TWO HUNDRED TWENTY-FIRST:   Plaintiff filed his Federal Complaint within Ninety (90) days of receipt of her Right to Sue Letter.

TWO HUNDRED TWENTY-SECOND:   To date, plaintiff continues to suffer harm due to the defendants' discriminatory and retaliatory treatment.

## AS AND FOR PLAINTIFF'S FIRST CASUE OF ACTION AGAINST BPB FOR RACE  DISCRIMINATION IN VIOLATION OF TITLE VII.

TWO HUNDRED TWENTY-THIRD:   Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED TWENTY-FOURTH:   Plaintiff, at all relevant times herein, was a member of a protected class under Title VII.

TWO HUNDRED TWENTY-FIFTH:        Plaintiff, at all times relevant herein, was qualified in his employment position with Defendant BPB.

TWO HUNDRED TWENTY-SIXTH:        Plaintiff   was   subjected   to   adverse employment actions and to a hostile work environment as set forth above because of Plaintiff's race.

TWO HUNDRED TWENTY-SEVENTH: As   a   proximate   result   of   BPB's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including, but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED TWENTY-EIGHTH:        BPB acted intentionally and with malice and reckless indifference to Plaintiff's statutorily protected rights.

TWO HUNDRED TWENTY-NINTH:        As   a   proximate   result   of   BPB's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

## AS AND FOR PLAINTIFF'S SECOND CASUE OF ACTION AGAINST BPB FOR RETALIATION IN VIOLATION OF TITLE VII

TWO HUNDRED THIRTIETH:        Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED THIRTY-FIRST: Plaintiff engaged in protected activity by reporting discriminatory conduct to his supervisors.

TWO HUNDRED THIRTY-SECOND:        As a result of plaintiff's engagement in protected activity, BPB began a series of retaliatory treatment directed towards plaintiff.

TWO HUNDRED THIRTY-THIRD: The retaliatory and adverse employment actions conducted against plaintiff occurred close in temporal proximity, to plaintiff's engagement in protected activity.

TWO HUNDRED THIRTY-FOURTH:    BPB acted knowingly, intentionally and with malicious intent altered the terms of plaintiff's employment in direct retaliation of his engagement in protected activity in direct violation of Title VII.

TWO HUNDRED THIRTY-FIFTH: As a proximate result of BPB's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including, but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to his employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED THIRTY-SIXTH: As a proximate result of BPB's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

**AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION AGAINST BPB FOR RACE DISCRIMINATION IN VIOLATION OF NYEL**

TWO HUNDRED THIRTY-SEVENTH:    Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED THIRTY-EIGHTH:    Plaintiff, at all relevant times herein, was a member of a protected class.

TWO HUNDRED THIRTY-NINTH:    Plaintiff, at all times relevant herein, was qualified in his employment position with Defendant BPB.

TWO HUNDRED FORTIETH:      Plaintiff was subjected to adverse employment actions and to a hostile work environment as set forth above because of Plaintiff's race.

TWO HUNDRED FORTY-FIRST:  As a proximate result of BPB's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including, but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to his employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED FORTY-SECOND:      As a proximate result of BPB's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

## AS AND FOR PLAINTIFF'S FOURTH CASUE OF ACTION AGAINST BPB FOR RETALIATION IN VIOLATION OF NYEL

TWO HUNDRED FORTY-THIRD: Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED FORTY-FOURTH:      Plaintiff engaged in protected activity by reporting discriminatory conduct to his supervisors.

TWO HUNDRED FORTY-FIFTH: As a result of plaintiff's engagement in protected activity, the BPB began a series of retaliatory treatment directed towards plaintiff.

TWO HUNDRED FORTY-SIXTH: The retaliatory and adverse employment actions conducted against plaintiff occurred close in temporal proximity, to plaintiff's first engagement in protected activity.

TWO HUNDRED FORTY-SEVENTH:    BPB acted knowingly, intentionally and with malicious intent altered the terms of plaintiff's employment in direct retaliation of his engagement in protected activity in direct violation of NYEL.

TWO HUNDRED FORTY-EIGHTH:    As a proximate result of BPB's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including, but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to his employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED FORTY-NINTH: As a proximate result of BPB's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

**AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION AGAINST NAGEL & SHAFIR FOR RACE DISCRIMINATION IN VIOLATION OF NYEL**

TWO HUNDRED FIFTIETH:    Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED FIFTY-FIRST:    Plaintiff, at all relevant times herein, was a member of a protected class.

TWO HUNDRED FIFTY-SECOND:    Plaintiff, at all times relevant herein, was qualified in his employment position with Defendant BPB.

TWO HUNDRED FIFTY-THIRD:   Plaintiff was subjected to adverse employment actions and to a hostile work environment as set forth above because of Plaintiff's race.

TWO HUNDRED FIFTY-FOURTH:    As a proximate result of Nagel's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including,

but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to his employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED FIFTY-FIFTH:   As a proximate result of Nagel's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

## AS AND FOR PLAINTIFF'S SIXTH CASUE OF ACTION AGAINST NAGEL & SHAFIR FOR RETALIATION IN VIOLATION OF NYEL

TWO HUNDRED FIFTY-SIXTH:   Plaintiff hereby repeats and realleges the allegations contained in the preceding paragraphs with the same force and effect as though set forth at length herein.

TWO HUNDRED FIFTY-SEVENTH:    Plaintiff engaged in protected activity by reporting discriminatory conduct to his supervisors.

TWO HUNDRED FIFTY-EIGHTH: As a result of plaintiff's engagement in protected activity, the defendants began a series of retaliatory treatment directed towards plaintiff.

TWO HUNDRED FIFTY-NINTH:   The retaliatory and adverse employment actions conducted against plaintiff occurred close in temporal proximity, to plaintiff's engagement in protected activity.

TWO HUNDRED SIXTIETH:    Nagel and Shafir acted knowingly, intentionally and with malicious intent altered the terms of plaintiff's employment in direct retaliation of hisengagement in protected activity in direct violation of NYEL.

TWO HUNDRED SIXTY-FIRST:  As a proximate result of Nagel's and Shafir's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses including,

34

but not limited to: deprivation of equal employment opportunities; loss of past and future earnings and other employment benefits; stains to his employment reputation; damages to his ability to secure similar employment in the future.

TWO HUNDRED SIXTY-SECOND:        As a proximate result of Nagel's and Shafir's discriminatory actions, Plaintiff has suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, mental and physical anguish.

**WHEREFORE,** Plaintiff demands judgment against the defendants as follows:

1. For a money judgment representing actual damages against BPB for its violation of plaintiff's rights under Title VII.

2.    For a money judgment representing compensatory damages against BPB for its violation of plaintiff's rights under Title VII.

3.    For a money judgment representing punitive damages against BPB for their violation of plaintiff's rights under Title VII.

7.    For a money judgment representing actual damages against BPB for its violation of plaintiff's rights under NYEL.

8.    For a money judgment representing compensatory damages against BPB for its violation of plaintiff's rights under NYEL.

9.    For a money judgment representing punitive damages against BPB for their violation of plaintiff's rights under NYEL.

10.    For a money judgment representing actual damages against Nagel and Shafir for their violation of plaintiff's rights under NYEL.

11.     For a money judgment representing compensatory damages against Nagel and Shafir for their violation of plaintiff's rights under NYEL.

12.     For a money judgment representing punitive damages against Nagel and Shafir for their violation of plaintiff's rights under NYEL.

13.     For equitable and injunctive relief;

14.     For reasonable attorney's fees and costs; and

15.     For such other relief as the Court may deem just and proper.

## JURY DEMAND

**Plaintiff hereby demands a trial by jury of all issues in this action.**

Dated: Islandia, New York
       November 5, 2021

**SCOTT MICHAEL MISHKIN, P.C.**

By:     Paul A. Carruthers, Esq.
        One Suffolk Square, Suite 240
        Islandia, New York 11749
        Telephone:  631-234-1154
        Facsimile:  631-234-5048
        *Attorneys for Plaintiff*